# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LAURENDA K. LACKTIS,

      Plaintiff,

v.                                        CV 13-1003 JAP/WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Laurenda Lacktis filed an application for Disability Insurance Benefits and Supplemental Security Income on October 28, 2009. (Administrative Record ("AR") 12.) She alleges disability beginning October 28, 2009,[1] due to bipolar disorder, hypoglycemia, hypotension, hypothyroid, panic disorder, and anxiety. (AR 35, 175.) Administrative Law Judge ("ALJ") Ann Farris held a disability hearing on February 15, 2012. (AR 28-61.) On March 8, 2012, the ALJ determined that Lacktis was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 9-27.) Lacktis filed an appeal with the Appeals Council, but the Council declined her request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-6.)

Lacktis sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Reverse or Remand Administrative Agency Decision (Doc. 24) and supporting Memorandum (Doc. 25). The Commissioner of the SSA ("Commissioner") responded (Doc. 26), and Lacktis filed a reply (Doc. 27). After having read and considered the entire record and the relevant law, I

---

[1] Lacktis initially alleged a disability onset date of July 24, 2004. (AR 170.)

recommend that the Court grant Lacktis's motion and remand this case to the SSA for proceedings consistent with this Proposed Findings and Recommended Disposition ("PFRD").

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). The Court may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2014). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a

claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). At the fourth step, the ALJ compares the claimant's RFC with the functional requirements of her past relevant work to see if the claimant is still capable of performing her past work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing her past work, then she is not disabled. *Id.* The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). If the claimant cannot return to her past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Lacktis is a forty-nine-year-old woman with a high-school education. (AR 135, 180.) From 1993 to 2001, Lacktis worked as a singer/actress in a family-run production. (AR 176.) She also worked as a cashier, receptionist, hair stylist, and telephonic salesperson between 1989 and 2009. (AR 176.)

The earliest record in the AR dates back to March 5, 1981. (AR 383-85.) A school evaluation reported that Lacktis, at age fifteen, read at a grade 6.3 equivalent, spelled at a grade 3.3 equivalent, and completed arithmetic at a grade 4.6 equivalent. (AR 383.) On September 18, 2000, Lacktis was reading at a grade 3.1 level. (AR 382.)

Lacktis began seeing J. Rachelle Bridges, M.D., in 2002. Dr. Bridges noted on January 8, 2002, that Lacktis had previously been diagnosed with hypothyroidism and was on medication for this. (AR 362.) Lacktis complained of weight gain, fatigue, dizziness, and feeling ill after eating sugary foods. (*Id.*) Dr. Bridges assessed Lacktis with hypothyroidism, obesity, fatigue, dizziness, nausea, and postmenopausal symptoms, due to a hysterectomy and oophorectomy at age twenty-seven. (*Id.*) Dr. Bridges evaluated Lacktis for hypoglycemia on February 7 and March 2, 2002, and referred her to Daniel Lyons, M.D., for a March 12, 2002, appointment regarding hypoglycemia. (AR 359-60, 369.) Dr. Lyons found "no evidence of serious underlying disease at this point." (AR 372.) On September 19, 2002, Lacktis saw Anita Waterman, RN/FNP, about changing her antidepressant medicine. (AR 354.) Lacktis stated that she wakes up in the middle of the night with anxiety attacks and hot flashes. (*Id.*)

On February 24, 2003, Lacktis started seeing Aslam Lodhi, M.D. (AR 301-03.) She complained of "hypoglycemic episodes" and panic attacks. (AR 301.) Dr. Lodhi found that Lacktis could potentially have a panic disorder, but he wanted to rule out other possibilities before making a diagnosis. (AR 303.) On March 12, 2003, Dr. Lodhi described Lacktis's "lightheadedness" and stated that this symptom could be caused by orthostatic hypotension or hypoglycemia. (AR 300.) Dr. Lodhi referred Lacktis to Mary Carroll, M.D., for a hypoglycemia consultation. (*Id.*) On April 1, 2003, Dr. Carroll assessed Lacktis with impaired glucose tolerance with postprandial hypoglycemia. (AR 349.) Dr. Carroll noted that this is the earliest phase of diabetes. (*Id.*) The following day, Lacktis went to Terry Rolan, M.D., for a consultation for dizziness. (AR 351.) Dr. Rolan found that Lacktis's symptoms were most consistent with orthostatic hypotension, and placed her on a salt supplement. (AR 297, 353.) On April 16, 2003, Dr. Carroll adjusted Lacktis's Synthroid dosage for hypothyroidism, found impaired glucose

tolerance but no evidence of diabetes, and noted no orthostatic hypotension on that day. (AR 346-47.)

On May 21, 2003, Dr. Lodhi arrived at four diagnoses: 1) that Lacktis probably has latent diabetes; 2) she suffers from orthostatic hypotension; 3) she has hypothyroidism with overreplacement, which has been corrected; and 4) that Lacktis suffers from a panic disorder. (AR 295.) On June 26, 2003, Dr. Lodhi added that Lacktis has a learning disability—"a severe form of dyslexia that makes reading and understanding numbers impossible for her." (AR 294.)

Lacktis began going weekly to the Carlsbad Mental Health Association on July 7, 2003. (AR 516.) Her intake assessment states that she has panic attacks, has difficulty going out in public, and often wakes up in a state of panic. (*Id.*) Elizabeth Harry, LISW, noted that Lacktis has a GAF of 50 and suffers from panic disorder without agoraphobia, learning disorder, hypoglycemia, orthostatic hypotension, and hypothyroidism.[2] (AR 313-14.)

Lacktis saw Dr. Bridges on August 15, 2003, for a follow-up visit. (AR 291-92.) On August 21, 2003, Dr. Bridges wrote a letter stating that Lacktis had been a patient of hers since May 2001 and that Lacktis had also worked at her clinic for a short time in 2002. (AR 290.) It became apparent after Lacktis began working at the clinic that she had dyslexia. (*Id.*) Dr. Bridges could not continue her employment because Lacktis could not perform her job duties. (*Id.*) Dr. Bridges opined, "I believe that it would be very difficult for Mrs. Lacktis to hold down a regular job because of this severe limitation from her dyslexia." (*Id.*)

---

[2] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005) (hereafter "DSM-IV"). A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.* Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, Lacktis's mental health providers used this scoring method.

On February 5, 2004, Lacktis discussed with Dr. Lodhi the possibility of having gastric bypass surgery. (AR 799.) Lacktis had a BMI of 37 and was hypertensive. (AR 799-800.) Lacktis consulted with David Syn, M.D., at the Advanced Bariatric Surgery Center on February 6, 2004, who found that Lacktis was an appropriate candidate for weight-loss surgery. (AR 449-53.)

Lacktis saw Babak Mirin, M.D., at the Carlsbad Mental Health Center ("CMHC") on February 16, 2004, upon referral by Dr. Lodhi for irritability and depression. (AR 541.) Dr. Mirin found Lacktis to be sad, anxious, and irritable. (AR 542.) Dr. Mirin diagnosed Lacktis with depression disorder, recurrent; panic disorder; rule out bipolar disorder. (AR 542.) On February 19, 2004, Lacktis reported to Harry that she was not having panic attacks anymore but that her depression continued to be a problem, she became agitated easily, and she cried often. (AR 794.)

On April 9, 2004, Dr. Lodhi noted that Lacktis was doing better as far as depression and anxiety; she was "taking her medications but not entirely as described but to a great extent." (AR 795-96.) Lacktis was trying to lose weight and diet in order to undergo gastric bypass surgery. (*Id.*) On May 10, 2004, Lacktis underwent a Roux-en-Y Gastric Bypass, performed by Dr. Syn. (AR 466.)

Lacktis saw Dr. Mirin on May 21, August 13, and November 10, 2004. (AR 535, 537, 538.) At each appointment, Lacktis was stable, low anxiety, doing well on her medications, and losing weight from the gastric bypass surgery. (*Id.*) After the visit on May 21, 2004, Dr. Mirin completed an Impairment Questionnaire (AR 787-90) and noted slight restrictions in activities of daily living; slight difficulties in maintaining social functioning; "often" deficiencies of concentration, persistence or pace; and three or more episodes of deterioration or decompensation (AR 790).

On December 9, 2004, Lacktis underwent a repair of an incisional ventral hernia, resulting from complications from her gastric bypass surgery. (AR 460.) At a follow-up visit on January 20, 2005, Dr. Syn indicated that Lacktis's diet and weight loss were acceptable, but that she was not exercising enough and was eating too few meals. (AR 463.)

On February 4, 2005, Dr. Mirin noted that Lacktis had separated from her second husband the month before. (AR 533.) Lacktis was anxious, moderately depressed, tearful, and having difficulty sleeping. (*Id.*)

The next record in the AR is from October 24, 2007. According to this record from the CMHC, Lacktis returned for treatment there after leaving New Mexico for a couple of years. (AR 544.) Lacktis reported dizziness, mostly managed by medication; anxiety/panic; and bipolar disorder. (*Id.*) Lacktis stated that she had been in "mental wards" several times because of "psychotic breaks." (*Id.*) Further, she explained that she divorced her second husband in large part because of her own promiscuous behavior during manic episodes. (AR 556.) Katherine Saltz, LPCC, assessed Lacktis with a GAF of 65.[3]

On November 28, 2007, Lacktis saw Ronald Haugen, CNS (Clinical Nurse Specialist). Lacktis stated, "I am doing fairly well right now and I just need to stay on my meds." (AR 562.) Lacktis reported continued anxiety, though better controlled than in the past. (*Id.*) She also described severe extremes of depression and mania associated with bipolar disorder. (AR 562.) When Lacktis is manic, she is "very hyperactive, hypersexual, very promiscuous, and . . . much more self confident than usual." (*Id.*) Haugen assessed Lacktis with bipolar I disorder in early

---

[3] A score between sixty-one and seventy is assessed when the patient is believed to have "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

7

remission; panic disorder without agoraphobia; marijuana abuse in remission; learning disorder; and hypoglycemia. (AR 563.) Haugen found Lacktis to have a GAF between 60 and 65.[4] (*Id.*)

On January 29, 2008, Lacktis reported to Haugen that she fell over the holidays and broke her two front teeth. (AR 568.) Lacktis stated that she enjoyed her new job at the Animal Care Clinic. (*Id.*) However, she also stated that emotions were "triggering past issues," she was feeling depressed at times, and she was stress eating. (*Id.*) On February 26, 2008, Lacktis reported that she was tolerating her medicine well, having less frequent mood swings, and experiencing less anxiety. (AR 566.)

On March 5, 2008, Lacktis went to the Pecos Valley Family Clinic ("Pecos Clinic") for a herpes follow up. (AR 625.) She had another appointment on July 2, 2008, to follow up again and have her prescriptions refilled. (AR 623.)

Lacktis returned to the CMHC on July 10, 2008, after a several month hiatus. (AR 570.) Lacktis reported losing her job at the Animal Care Clinic due to her dyslexia. (*Id.*) She expressed concern about her mood swings, especially the manic spells. (*Id.*) A few weeks later, on July 31, 2008, Lacktis reported being "really manic," picking at holes in the cement and cleaning her home excessively. (AR 580.)

During a manic episode on August 7, 2008, Lacktis checked in to the Carlsbad Medical Center emergency room. (AR 671.) Lacktis stated that she did not take medications for four days, did meth for three days, and had indiscriminate sex with a neighbor. (AR 578.) On August 13, 2008, Lacktis reported to Haugen that her mood was stable, though she experienced some anxiety. (AR 577.)

---

[4] A score between fifty-one and sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

Lacktis returned to the emergency room at the Carlsbad Medical Center on August 24, 2008, after a possible suicide attempt. (AR 669.) She overdosed on Ativan, which she stated she took several of in order to help her sleep. (AR 679.) Lacktis was also diagnosed with abnormally low sodium in her blood, probably secondary to psychogenic excessive thirst. (*Id.*)

On September 4, 2008, Lacktis reported to Haugen increased depression due to stress. (AR 575.) On October 10, 2008, Lacktis told Haugen that she was doing better overall, with improved mood, appetite, and sleep, but she experienced anxiety and irritability at times. (AR 572.)

Lacktis went to the Carlsbad Medical Center on October 13, 2008, for edema in her left ankle. (AR 661.) She had acute fractures of the left distal fibula and left distal tibia. (AR 665.) Lacktis received an ankle gel splint and crutches. (AR 661.)

Lacktis reported to Haugen on November 17, 2008, that she was doing quite well, though her anxiety level was persistent. (AR 583.) Haugen described Lacktis's mood as mildly anxious with a congruent affect. (*Id.*)

On December 9, 2008, Lacktis visited Pecos Clinic for diarrhea that began after she started a new job. (AR 622.) The next day, Lacktis went to the Carlsbad Medical Center for further treatment. (AR 655-59.)

At Pecos Clinic on January 9, 2009, Lacktis received a prescription refill and was assessed with bipolar disorder, irritable bowel syndrome, hypothyroid, herpes, gastroesophageal reflux disease, and hormone replacement therapy. (AR 621.)

Lacktis answered questions for a CMHC Annual Clinical Assessment Update on March 25, 2009. (AR 591.) She reported anxiety, excessive worry, fatigue, irritability, manic episodes, paranoia the previous evening, and panic attacks two to three times per week. (AR 591.) On

April 3, 2009, Lacktis informed Haugen that she had been on heroin for about one month, that she was paranoid and not sleeping well, and that she had gone to live with her father, who was helping her with her medications. (AR 587.)  By April 16, 2009, Lacktis reported an improved mood, but continued anxiety. (AR 585.) She was medication compliant with assistance from her father. (*Id.*) Lacktis followed up at Pecos Clinic on May 20, 2009, and June 9, 2009, to discuss medications and review labs. (AR 618-19.)

On June 19, 2009, Lacktis went to the Carlsbad Medical Center for pain in the left upper arm, mid shaft. (AR 651.) She had locked herself out of the house two months prior, crawled through a bathroom window, and fallen into the tub, injuring her left arm. (*Id.*) She was assessed with acute cervical strain. (AR 654.)

On June 22, 2009, Prentis Gunter, M.D., from CMHC saw Lacktis. She was assessed with bipolar I disorder, anxiety disorder, hypoglycemia, orthostatic hypotension, herpes simplex, hypothyroidism, and aplastic anemia, with a GAF of 45. (AR 595-97.) On July 22, 2009, Lacktis reported that she was doing well, though she said that she has some anxiety and depression and overuses Clonazepam. (AR 604.) She was sleeping only four to four and a half hours per night. (AR 607.) She had recently gotten a job as a front desk clerk at a local hotel. (*Id.*) Her mood was euthymic, and affect appropriate. (*Id.*) Haugen advised Lacktis to take her medication as prescribed. (AR 604.)

On August 20, 2009, Dr. Gunter increased Lacktis's prescriptions for Abilify and Lamictal. (AR 606.) When Lacktis spoke, she bounced from topic to topic. (*Id.*) While she had started a new job, she was finding that eight hours per day was too physically demanding. (*Id.*) Her mood was euthymic, and affect appropriate. (*Id.*)

Lacktis saw Deanna Suggs, RN, at CMHC on October 9, 2009. (AR 611.) On October 21, 2009, Lacktis was admitted to the Carlsbad Medical Center, but asked to be released without treatment because she was not suicidal. (AR 677.) Lacktis had told a therapist that she had thought of not waking up and letting everything go. (*Id.*) She signed a contract not to harm herself and was released from the hospital without treatment. (*Id.*)

Lacktis went to Pecos Clinic on October 23, 2009, to review lab results. (AR 617.) She visited the Carlsbad Medical Center on November 4, 2009, for depression. (AR 678.) On December 15, 2009, Lacktis reported to Haugen that she was doing well, had a stable mood, good appetite and sleep, and her anxiety under control. (AR 853.) She was living in her own apartment and requested a letter allowing her to have her dog in her apartment for therapy purposes. (*Id.*; *see also* AR 183.) Lacktis was taking her medications as prescribed. (AR 853.)

On January 7, 2010, state agency consulting physician Scott R. Walker, M.D., completed a mental RFC assessment. (AR 727-29.) Dr. Walker found Lacktis to be moderately limited in most subcategories of sustained concentration and persistence and social interaction. (AR 727-28.) He also found that she was moderately limited in her ability to understand and remember detailed instructions, her ability to respond appropriately to changes in the work setting, and her ability to set realistic goals or make plans independently of others. (*Id.*) Dr. Walker concluded that Lacktis did not meet paragraph B or C requirements of listing numbers 12.02 (organic mental), 12.03 (schizophrenic, etc.), 12.04 (affective), or 12.06 (anxiety-related). (*See* AR 742.) Dr. Walker noted that Lacktis's "allegations are partially credible, eroded by treatment non-compliance and heroin/methamphetamine abuse. The report of illiteracy is not consistent with her education, work history or signature . . . ." (AR 729.) Lacktis "generally remains stable and symptoms are well controlled when compliant with medication." (AR 743.) Dr. Walker noted

11

that Lacktis showed a pattern of treatment non-compliance and drug abuse and that her mania was associated with said drug abuse and medication non-compliance. (*Id.*) Renate Wewerka, Ph.D., a stage agency consultant, later affirmed Dr. Walker's findings on June 1, 2010, noting that Lacktis could perform semi-skilled jobs. (AR 770.)

Lacktis returned to Haugen on January 12, 2010. She reported feeling anxiety, perhaps due to her efforts to improve her situation. (AR 855.) She was applying to Walmart. (*Id.*) Lacktis had run out of Clonazepam a week and a half before and had not yet gotten a prescription refill. (*Id.*) Lacktis displayed a bright and full-ranged affect. (*Id.*) Haugen noted that Lacktis's mood was stable with her current medications but that she has "chronic and severe mental illness that will need ongoing psychiatric care." (*Id.*)

On January 15, 2010, state agency consulting physician Lawrence Kuo, M.D., performed a Case Analysis. (AR 745.) Dr. Kuo found that Lacktis has multiple physical medically determinable impairments, but that all are non-severe. (*Id.*) Dr. Kuo noted that Lacktis stated that she can perform all personal care, prepare meals, care for pets, drive a car, complete household chores, and walk for thirty minutes. (*Id.*) N.D. Nickerson, M.D., another stage agency consulting physician, later affirmed Dr. Kuo's findings. (AR 769.)

Lacktis reported to Haugen on February 9, 2010, that she had received a job as a cashier with Walmart and that she was doing well overall. (AR 857.)

On March 1, 2010, Lacktis went to the Carlsbad Medical Center for pain in her lower back and the right side of her neck due to a rear-end driving collision. (AR 752.) Radiology reports showed no compression fracture or spondylolisthesis. (AR 763.) Lacktis did have a very mild spur formation in the lower vertebrae from very mild degenerative disk change. (AR 763-64.)

On March 25, 2010, Lacktis reported to Haugen that she was doing well, that her mood and anxiety level were well maintained, and that she was taking her medications as prescribed. (AR 859.) However, she lost her job at Walmart due to stress. (*Id.*) She was living independently in her own apartment. (*Id.*) A few weeks later, on April 14, 2010, Lacktis went to the Carlsbad Medical Center emergency room for depression. (AR 761.)

Lacktis visited Haugen on May 20, 2010, reporting that her mood and anxiety level were well maintained. (AR 861.) Haugen noted that Lacktis was taking an active approach to improving her current status and that she had made tremendous improvements over the past couple of years. (*Id.*)

On July 19, 2010, Lacktis began seeing psychiatrist Neal Musselman, D.O., for treatment and medication management. (AR 863.) Lacktis reported a stable mental status and was compliant with her medications. (*Id.*) On August 24, 2010, however, Lacktis complained of increased dysphoria over the previous two weeks and associated anxiety. (AR 864.) She sometimes doubled her Xanax. (*Id.*) Dr. Musselman noted that Lacktis was tearful. (*Id.*) He adjusted her medications. (AR 866.) By September 13, 2010, Lacktis had a significantly improved mental status. (*Id.*)

Also on September 13, 2010, Lacktis visited Taddy Healthcare Services, LLC, ("Taddy") to establish a primary care provider. (AR 920.) On October 11, 2010, Lacktis went to Taddy for a pelvic exam and complained of weight gain. (AR 918.) She followed up with Taddy on November 1 and 23, 2010, and February 8, 2011, to discuss weight management and other matters. (AR 910, 912, 914-16.)

On October 25, 2010, Lacktis presented to Dr. Musselman with a stable mental status and in compliance with her medications. (AR 867.) Lacktis reported feeling "real good" and had an

appropriate affect on December 6, 2010. (AR 892.) However, on February 7, 2011, Lacktis complained of significantly increased dysphoria/anxiety over the past month. (AR 869.) Dr. Musselman found Lacktis's mood depressed, and noted that she had a rather blunted affect. (*Id.*) By March 7, 2011, Lacktis's mental status had improved, and she was compliant with her medications. (AR 870.) Dr. Musselman wrote that, "Despite this improvement in her recent mental status, her pursuit of [social security] benefits is endorsed and supported." (*Id.*)

Lacktis went to Taddy on March 15, April 12, May 23, July 19, and December 14, 2011, for various follow ups, temporary ankle pain, and addressing tobacco dependency, obesity, and a herpes outbreak. (AR 901-02, 904, 906-08.)

On April 18, 2011, Dr. Musselman noted that Lacktis had a stable mental status, with medication compliance. (AR 871.) On June 22, 2011, Dr. Musselman indicated that Lacktis's mood was "really good," with appropriate affect. (AR 872.) Lacktis was maintaining a housekeeping business at the time. (*Id.*) Further visits with Dr. Musselman on September 7 and December 7, 2011, indicate a continued stable mental status. (AR 873-4.) Lacktis's mood was "real good," with a bright and spontaneous affect, on the latter date. (AR 874.)

On January 20, 2012, Dr. Musselman completed a Medical Source Statement. (AR 772-77.) He stated that Lacktis's current GAF was 45, and her highest GAF in the past year was 55. (AR 772.) Dr. Musselman wrote that Lacktis had a recent exacerbation of manic signs and symptoms, and he noted bipolar disorder, impairments in impulse control, mood disturbances, difficulty thinking or concentrating, and psychomotor agitation or retardation. (AR 773.) As to Lacktis's mental abilities and aptitudes to do unskilled work, Dr. Musselman marked "unable to meet competitive standards" for most of the abilities or aptitudes and "seriously limited, but not precluded" or "no useful ability to function" for the remaining few. (AR 774.) Dr. Musselman

14

explained that "[Lacktis has a] history of breakthrough episodes of mania despite maintained and an extensive medication regimen." (*Id.*) With regard to functional limitations, Dr. Musselman found marked restrictions in activities of daily living and marked difficulties in maintaining concentration, persistence or pace. (AR 776.) He found extreme difficulties in maintaining social functioning and four or more episodes of decompensation within a twelve-month period, each of at least two weeks duration. (*Id.*) Dr. Musselman noted that "during manic episodes," Lacktis has a complete inability to function independently outside of her home. (*Id.*) He also wrote that Lacktis would have difficulty working at a regular job on a sustained basis due to "the unpredictable nature of [her] manic episodes." (AR 777.)

On February 13, 2012, Barbara Asbury, Lacktis's mother, wrote a letter addressing Lacktis's history of struggles with bipolar disorder, anxiety, depression, and dyslexia. (AR 247-48.) Asbury stated that for most of Lacktis's life, she has had to accompany Lacktis on errands, and Lacktis spends much of her time alone in her room so that she does not have to be around people. (*Id.*) Lacktis's father handles her medication since she overdosed in 2008. (AR 248.)

On February 14, 2012, Sharleen Strong, Lacktis's sister, wrote an affidavit. (AR 254.) Strong explained that, as a child, Lacktis could not leave their mother for long. (*Id.*) Lacktis's mother helps Lacktis remember her appointments and attends most of the appointments, though sometimes she just sits in the car. (*Id.*) Strong stated that Asbury has been Lacktis's "security blanket her entire life." (*Id.*)

Following the ALJ's decision, Dr. Musselman wrote a letter to Lacktis's attorney on May 10, 2012, stating that he was disappointed with the ALJ's determination that Lacktis was not entitled to benefits and her decision to accord little weight to Dr. Musselman's opinion. (AR 935.) Dr. Musselman noted that the consulting physicians seemed to view Lacktis's mania as a

result of drug abuse and medication noncompliance, rather than the drug abuse and noncompliance being a result of the mania. (*Id.*) He stated that there is a "misconception that the symptoms of bipolar disorder (drug abuse and noncompliance during manic episodes) are volitional acts of the patient confusing the causes and effects of these periods of mood instability." (*Id.*) "A patient with bipolar disorder who is stable and compliant at one point may at any time breakthrough to a manic episode for unknown reasons and behave uncharacteristically." (*Id.*) Dr. Musselman wrote that Lacktis's mental disorders and symptoms were attenuated by Lacktis "living with and being virtually completely dependent upon her mother." (*Id.*) He characterized this living environment as a "highly structured and supportive setting with decreased mental and emotional demands which have diminished overt pathological signs and symptoms of her disorder." (*Id.*) Dr. Musselman opined, "As her primary psychiatrist I believe she cannot be expected to work on a sustained basis, more than part-time at simple work without a structured support and the psychotropic medication she requires." (*Id.*)

With respect to Lacktis's statements about feeling really good, Dr. Musselman wrote that such sentiments "do not make irrelevant or contradict her chronic psychiatric disorders [of] at . . . least 2 years of severe signs and symptoms currently attenuated by effects of medication[,] treatment[,] and psychosocial support." (*Id.*) He added that Lacktis has a history of one or more years of inability to function outside of a highly supportive living environment. (AR 935-36.)

Dr. Musselman saw Lacktis on May 21, 2012. (AR 940-41.) Lacktis complained of heightened anxiety, insomnia, mood swings, and dysphoria. (AR 940.) She stated that she had lost some of her medicine. (*Id.*) Lacktis presented disheveled, with increased agitation and irritability, a confused and unstable mood, and labile affect. (AR 940-41.) Dr. Musselman

assessed Lacktis with decompensation of mental status secondary to disrupted medication compliance. (AR 941.)

**HEARING TESTIMONY**

The ALJ held a hearing on February 15, 2012, at which Lacktis and a Vocational Expert ("VE") testified. (AR 28-61.) Lacktis was represented by an attorney. (*Id.*)

Lacktis's attorney made an opening statement. (AR 33-34.) Then, Lactis testified. She worked in the kennel area of the Animal Care Center for a brief time, but that job was too stressful for her. (AR 34-35.) She stated that the job was fast paced, and she started to panic working with the animals, the staff, and the animals' owners and when trying to read the names of the animals, their medicines, and their owners. (*Id.*) Lacktis and her employer came to an understanding that she should find other employment. (AR 35-36.)

Lacktis testified that she received a high school diploma, but that she has dyslexia and was placed in special education, where she just played Uno all day. (AR 36.) Despite F's on her report cards, she was passed along and graduated. (*Id.*)

Lacktis worked at Walmart for a short time, initially as a cashier. (*Id.*) She could not understand the numbers, panicked, and left the register. (*Id.*) Walmart reassigned her to be a greeter, but she could not work with the public or be around crowds of people. (AR 36-37.) Earlier, she worked at a hair salon in a Walmart. (AR 47.) However, she could not continue because she could not handle the people, properly mix chemicals, read instructions, keep up with new hairstyles, or correctly cut angles. (AR 47-50.) In the workplace, she takes criticism personally and cries. (AR 54.) She testified that she went to the Division of Vocational Rehabilitation but could not receive a placement because of her dyslexia and bipolar disorder. (AR 40.)

Lacktis testified that she has a "swelled" thyroid and takes Synthroid for that. (AR 37.) She also testified that she has bipolar disorder. (*Id.*) Lacktis experiences headaches, loss of memory, insomnia, and soreness. (AR 37-38.) She goes to counseling, occasionally with her pastor, and every two weeks with Dr. Musselman. (AR 38-39.) Lacktis testified that she has episodes of "spinning," where she feels like she is running around inside of herself, when something happens in her life. (AR 38-39.) Dr. Musselman helps her a lot. (AR 50.) Before Lacktis saw Dr. Musselman, she went to Haugen. (AR 50-51.)

The ALJ noted that Lacktis tested positive for cocaine in 2009. (AR 39.) Lacktis testified that she did not remember ever using cocaine or methamphetamine. (AR 40, 44.) She remembered using heroin in her twenties. (AR 44.) Lacktis testified that she used marijuana for a time, but not in the previous year. (*Id.*)

Lacktis testified that she lives with her parents. (AR 41.) She is able to drive. (*Id.*) She intentionally took her written driving test for her license at a facility that does not grade the driving exams. (*Id.*) Lacktis goes to the grocery store with her mother, but she does not do the shopping. (*Id.*) For hobbies, she sings in her church choir, walks, and is thinking about joining Curves. (*Id.*) Lacktis gets along with people at her church. (*Id.*) She does not belong to any other organizations, nor does she have any friends that she sees regularly. (AR 42.) However, Lacktis is close with her family; she watches television with them, sometimes goes to Sonic, and has gone to a Christian concert—but she had to stay by the door because she cannot handle being around a lot of people. (*Id.*)

On a regular day, Lacktis gets up around 5:00 a.m., drinks coffee, sees her son off to work at 6:00 a.m., and then helps her mother around the house for the rest of the day before

18

going to bed at 8:00 p.m. (AR 42-43.) Lacktis sleeps alright with medication. (AR 43.) Lacktis has good days and bad days—about two good days and five bad days per week. (AR 53.)

Lacktis testified that she underwent gastric bypass surgery. (AR 44.) Since the surgery, she has had an operation for a hernia, and she has had two ulcers. (*Id.*) Lacktis also regained much of the weight lost; she has regained one hundred pounds in five years. (*Id.*)

Lacktis explained that she was hospitalized a number of times for psychiatric treatment. (AR 45.) She was hospitalized twice in Missouri, perhaps seven years prior to the hearing, and another time in Roswell, New Mexico. (AR 45-46.) However, Lacktis stated that she cannot remember dates and times. (AR 47.)

Lacktis testified that she has tried living on her own, but that it is very difficult for her. (AR 51.) She would like to try living on her own again sometime in the near future. (*Id.*) She affirmed that she would not have been able to live on her own the prior couple of years. (*Id.*) Due to anxiety and depression, she would not get out of bed if she lived by herself. (AR 52.) Her mother helps her remember doctors' appointments. (*Id.*) While Lacktis can care for herself and keep herself clean, she cannot read recipes and cooks only a small amount. (*Id.*)

Lacktis testified that she had been part of her family's musical show in Branson, Missouri, about the life of Christ. (AR 54.) Her job was to sing and carry a vase onstage and offstage. (AR 55.) She does not read music and must learn by ear. (AR 56.) Her family surrounded her. (AR 55.) She testified that being surrounded by family and people she knew was the only way that she could make a living. (*Id.*) When investors shut the show down, she moved back to New Mexico. (*Id.*)

The ALJ next questioned the VE. (AR 57-59.) The ALJ asked the VE to assume a person of Lacktis's age, education, and work history, who has no exertional limitations, can make

19

simple work-related decisions with few workplace changes, can have no interaction with the public and only occasional and superficial interactions with co-workers, and should have no requirement to read instructions or write reports, but can read very simple lists. (AR 58-59.) The VE testified that such a person could not perform Lacktis's previous work. (AR 59.) However, such a person could work as a laundry worker, a cleaner/preparer, or a dishwasher. (*Id.*)

Lacktis's attorney then questioned the VE. (AR 60.) Lacktis's attorney asked whether such a person would be precluded from the jobs listed if she was distracted as much as twenty to twenty-five percent of the day from persistence and pace and would miss three to four days per month of work. (*Id.*) The VE testified that such a person would not be able to maintain employment. (*Id.*)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Lacktis's application for benefits according to the sequential evaluation process. (AR 9-27.) At the first step, the ALJ found that Lacktis had not engaged in substantial gainful activity since October 28, 2009, the application date and amended alleged onset date. (AR 14.) Then, at the second step, the ALJ concluded that Lacktis suffers from the severe impairments of anxiety with panic attacks, bipolar disorder, and polysubstance abuse. (*Id.*) At step three, the ALJ found that Lacktis's combination of severe impairments did not equal one of the listed impairments. (AR 15.)

With respect to step three, the ALJ stated that Lacktis's mental impairments do not meet or medically equal the criteria of listing 12.06. (*Id.*) As to "paragraph B" criteria, the ALJ concluded that Lacktis has had one or two episodes of decompensation and that she has mild restriction in activities of daily living and moderate difficulties in maintaining social functioning

and concentration, persistence, or pace. (*Id.*) With respect to "paragraph C" criteria, the ALJ simply stated that the evidence failed to establish the presence of such criteria. (*Id.*)

The ALJ then determined Lacktis's RFC, finding that Lacktis could perform a full range of work at all exertional levels but with the following nonexertional limitations: 1) the work must involve only simple work-related decisions, with few workplaces changes; 2) Lacktis can have no interaction with the public and only occasional and superficial interaction with co-workers; and 3) Lacktis should have no requirement to read instructions or write reports, but she can read very simple lists. (AR 16.)

The ALJ summarized Lacktis's testimony and the AR. She noted that she gave "little weight" to Dr. Musselman's medical source statement from January 20, 2012, which stated that Lacktis had "marked" restrictions in activities of daily living; "marked" difficulties in maintaining concentration, persistence, and pace; "extreme" limitations in maintaining social functioning; and "four or more" episodes of decompensation within a 12-month period, each of at least two weeks duration. (AR 19.) The ALJ referenced visits with Dr. Musselman in which Lacktis reported a stable mental status and exhibited a "real good" mood and bright and spontaneous affect. (*Id.*) While the ALJ noted Lacktis's increased anxiety/dysphoria during a February 7, 2011, appointment with Dr. Musselman, the ALJ also mentioned Lacktis's improvement the follow month, quoting Dr. Musselman to say that "despite improvement in her recent mental status, the claimant was pursuing her claim for Social Security benefits." (AR 19-20.) Further, the ALJ stated that Lacktis's daily activities are not limited to the extent one would expect, given her complaints. (AR 20.)

The ALJ instead gave "significant weight" to state agency medical consultants. (*Id.*) She concurred with the consultants' finding that the records show a pattern of non-compliance with

treatment, drug abuse, and mania that was derived from that non-compliance with treatment and drug abuse. (*Id.*) The ALJ asserted that the records show that medication has been relatively effective in controlling Lacktis's symptoms.

The ALJ concluded at step four that Lacktis could not perform past relevant work. (AR 20.) Nonetheless, at step five, the ALJ found that, considering Lacktis's age, education, work experience, and RFC, Lacktis could perform the work of a laundry worker, cleaner/preparer, or dishwasher. (AR 21.) As the ALJ determined that Lacktis could perform jobs existing in substantial numbers in the national economy, the ALJ concluded that Lacktis was not disabled. (AR 21-22.)

Lacktis appealed the decision to the Appeals Council, but the Council found that Lacktis's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-6.) The Appeals Council stated that it looked at the additional evidence provided, including the records from Dr. Musselman dated May 10 and 21, 2012, and Lacktis's attorney's brief dated May 21, 2012. (AR 1, 4.) The Appeals Council stated that it "considered whether the [ALJ's] action, findings or conclusion is contrary to the weight of evidence currently of record. We found that this information does not provide a basis for changing the [ALJ's] decision." (AR 1-2.)

### DISCUSSION

Lacktis makes several arguments for reversing and remanding this case. I have reordered these arguments to accord with the five-step sequential evaluation process. Lacktis first argues that the ALJ erred at step two by failing to find that Lacktis's obesity, dyslexia, and thyroid disease are not severe. Next, at the third step, Lacktis claims that the chronicity of her mental illness, inability to sustain employment, and dependence on her family clearly meet the listings at

§ 12.04(C). At the RFC stage, Lacktis makes three contentions: First, she argues that the ALJ should have given controlling weight to Dr. Musselman's opinions and that the decision violates Social Security Ruling ("SSR") 96-2p, 1996 WL 374188 (July 2, 1996), and 20 C.F.R. § 404.1527.[5] Second, Lacktis argues that the ALJ erred in disregarding the findings of state agency medical consultant Dr. Walker in making her RFC assessment. Third, Lacktis claims that the Appeals Council erred by disregarding Dr. Musselman's May 10, 2012, letter explaining Lacktis's mental state. Finally, Lacktis argues generally that the decision is not supported by substantial evidence.

## I.      Step Two Findings

Lacktis argues that the ALJ erred in failing to find that her obesity, dyslexia, and hypothyroidism were severe impairments. Lacktis notes evidence in the record to support her contention and states that step two requires only a de minimis showing of impairment in order to be considered severe.

The Commissioner argues that Lacktis's claim is misplaced because the ALJ proceeded to subsequent steps, in particular, step four, in which the ALJ made an RFC assessment based on both severe and non-severe impairments. The Commissioner notes that the ALJ specifically accounted for Lacktis's dyslexia in the RFC by including that Lacktis cannot be required to read instructions or write reports and that Lacktis can only read very simple lists.

"[A]ny error [at step two is] harmless where the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of

---

[5] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

the evaluation sequence." *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *see also*

*Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) ("We can easily dispose of . . .

arguments[] which relate to the severity of [claimant's] impairments. The ALJ . . . made an

explicit finding that [claimant] suffered from severe impairments. That was all the ALJ was

required to do in that regard. [Claimant]'s real complaint is how the ALJ ruled at step five.").

In this case, the ALJ found three severe impairments—anxiety with panic attacks, bipolar

disorder, and polysubstance abuse—and considered Lacktis's herpes, dyslexia, obesity, and

hypothyroidism to be non-severe impairments. (AR 14-15.) The ALJ did not make a finding of

non-disability at step two, but rather proceeded through all five steps of the sequential evaluation

process. As such, I find that even if the ALJ erred in failing to find that certain impairments were

severe, such an error would be harmless because the ALJ continued through the sequential

evaluation process. Therefore, I recommend that the Court find that Lacktis's first argument is

without merit.

## II.     Step Three and RFC Findings

Lacktis next argues that the ALJ erred in not finding disability at step three because she

clearly meets listing 12.04(C)(3). She contends that the opinions of Dr. Musselman were entitled

to greater weight. Lacktis also states that "for many years, [she] has been unable to live on her

own and has required to live with her parents and be dependent upon her mother, Barbara

Asbury, for all the necessities of life." (Doc. 25 at 21.) Lacktis asserts that the ALJ completely

failed to consider this section of the listing, which involves a

> chronic affective disorder of at least 2 years' duration that has caused more than a
> minimal limitation of ability to do basic work activities, with symptoms or signs
> currently attenuated by medication or psychological support, and . . . [a] [c]urrent
> history of 1 or more years' inability to function outside a highly supportive living
> arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(C)(3). Lacktis summarizes various efforts to work and her lack of competence to keep a job. (Doc. 25 at 21-22.) Lacktis further argues that the ALJ violated SSR 96-7p by ignoring her testimony and statements from her sister, Sharleen Strong, and mother, Barbara Asbury, describing a "pathologic dependence upon her mother and family for support." (AR 25 at 22.)

The Commissioner argues that there is conclusive evidence that Lacktis does not require a "highly supportive living arrangement" because such an arrangement only exists in the most structured environments, such as prisons or live-in mental health institutions. The Commissioner also notes the ALJ's mention of Lacktis's ability to cook, drive, help with cleaning, sing in a choir, and work part-time as a hotel clerk.

Lacktis points out that the introductory section on mental disorders, § 12.00, discusses the effects of structured settings and specifically states, "Highly structured and supportive settings may . . . be found in your home." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(F); *see also Rosic v. Comm'r of Soc. Sec.*, No. 1:09CV1380, 2010 WL 3292964, at *7 (N.D. Ohio Aug. 19, 2010) ("The term 'highly supportive living arrangement' refers to shelters or group homes, inpatient psychiatric treatment, or an inability to live on one's own.").

As a preliminary matter, while the claimant has the burden of demonstrating that she is entitled to benefits, a social security disability hearing is nevertheless a nonadversarial proceeding. *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). Therefore, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *see Madrid*, 447 F.3d at 790. Where the

AR suggests a "reasonable possibility" that a claimant meets a listing, the ALJ has a duty to develop the record. *Soverns v. Astrue*, 501 F. Supp. 2d 1311, 1322 (D. Kan. 2007).

The ALJ in this case does not mention listing 12.04 anywhere in her decision. The ALJ only discusses listing 12.06. (AR 15-16.) Nonetheless, the ALJ concluded that Lacktis has moderate difficulties with respect to social functioning and concentration, persistence, or pace. (AR 15.) Such a conclusion seems to indicate "more than a minimal limitation of ability to do basic work activities." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(C). It is also clear from the AR that Lacktis has been assessed with bipolar disorder for several years and that, while on medication, her mental status is often stable, with appropriate affect. Therefore, I proceed to address § 12.04(C)(3)'s requirement of a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."

There are several mentions throughout the AR that suggest such a history and continuing need, while there are other parts that make it difficult to isolate a one or more year period of time where a highly supportive living arrangement was required. Haugen's notes reflect that on April 3, 2009, Lacktis was living with her father, who was helping her manage her medicines. (AR 587.) However, Lacktis was living alone as of November 2009. (AR 140, 183, 192.) She was still living independently on March 25, 2010. (AR 859.) Yet Lacktis testified on February 15, 2012, that she was living with her parents. (AR 41.) She stated, "I've tried that, living on my own. It's very difficult, it is very difficult for me to be alone . . . ." (AR 51.) Lacktis also responded, "No, sir" to her attorney's question, "the way things have been in the last couple of years, have you been able to live on your own if it weren't just the money issue?" (*Id.*) The ALJ did not ask Lacktis to clarify how long, starting on which date, she had been living with her parents or seek

other ways to develop the record to determine whether Lacktis had been in a highly supportive living arrangement for one or more years.

Dr. Musselman's May 10, 2012, letter, which was entered into evidence by the Appeals Council (*see* AR 4, 935-36), seems to answer the question about whether Lacktis met the length requirement for living with her parents and whether she will continue to need a highly supportive living arrangement. Dr. Musselman wrote that Lacktis is "virtually completely dependent upon her mother." (AR 935.) He opined that Lacktis would relapse on the symptoms from her psychiatric disorders if she stopped living in her mother's home. (*Id.*) Dr. Musselman specifically stated that Lacktis's "history of one or more years of an inability to function outside a highly supportive living arrangement indicates a continued need for such structure." (AR 935-36.) He also stated that Lacktis has "chronic psychiatric disorders [of] at [] least 2 years of severe signs and symptoms currently attenuated by effects of medication treatment and psychosocial support." (AR 935.)

The Appeals Council found that the new information of record did not provide a basis for changing the ALJ's decision. (AR 2.) Evidence added to the record by the Appeals Council "becomes part of the administrative record to be considered when evaluating the [Commissioner's] decision for substantial evidence." *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994). Yet as noted, the Court may neither reweigh the evidence nor substitute its discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). Instead, the Court must "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800-01 (10th Cir. 1991). The Appeals Council did not state the weight it accorded Dr. Musselman's

opinions. The ALJ, however, applied "little weight" to the January 20, 2012, medical source statement from Dr. Musselman. (AR 19.) And Lacktis argues that the ALJ violated SSR 96-2p, 1996 WL 374188, and 20 C.F.R. § 404.1527 in reaching her conclusion to accord little weight to treating physician Dr. Musselman's opinion and should have instead accorded controlling weight.

A case may be remanded at step three where the ALJ improperly assesses the opinions of treating physicians. *See Coast v. Colvin*, No. 12-CV-02887-RBJ, 2014 WL 222600, at *4 (D. Colo. Jan. 21, 2014). While an argument regarding a treating physician analysis is often brought at step four or five, "it applies with equal force to the ALJ's evaluation of the medical evidence at step 3." *Id.* at *4 n.2. Because a legal error in the treating physician analysis would negate the need to determine whether the ALJ's decision is supported by substantial evidence, including the new evidence from Dr. Musselman, I next examine the sufficiency of the ALJ's explanation for according Dr. Musselman's decision little weight.

The ALJ explained that she accorded little weight to Dr. Musselman's opinion because Lacktis had a stable mental status at most of her appointments with Dr. Musselman and was compliant with her medications. (*See* AR 19.) The ALJ pointed out that, even though Lacktis had increased anxiety/dysphoria on February 7, 2011, her mental status had improved by the following month. (*Id.*) The ALJ also noted that Lacktis's mood was "real good" and her affect was bright and spontaneous on December 7, 2011. (*Id.*) The ALJ further discounted Lacktis's own credibility because of Dr. Musselman's comment on March 7, 2011, which the ALJ quoted as: "despite improvements in her recent mental status, the claimant was pursuing her claim for Social Security benefits." (AR 20.)

With respect to treating physicians, an ALJ must complete a sequential two-step process for evaluating a medical opinion. *See Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must decide whether a treating doctor's opinion commands controlling weight. *Id.* A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374180, at *2 (July 2, 1996)). If a treating doctor's opinion does not meet this standard, the opinion is still entitled to deference to some extent as determined under the second step of the process. *Id.* In this second step, the ALJ must determine the weight to accord the treating physician by analyzing the treating doctor's opinion against the several factors provided in 20 C.F.R. §§ 404.1527(c), 416.927(c). *Id.* (quotation omitted).

Pursuant to 20 C.F.R. §§ 404.1527(c), 416.927(c). "[r]egardless of its source, [the ALJ] will evaluate every medical opinion [he or she] receive[s]. Unless [the ALJ] give[s] a treating source's opinion controlling weight under paragraph (c)(2) of this section, [the ALJ] consider[s] all of the following factors in deciding the weight [to] give to any medical opinion."[6] According

---

[6] These factors include:

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

to SSR 96-2p, if a treating physician's opinion is not entitled to controlling weight, the "opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." 1996 WL 374188, at *4.

The ALJ's discussion indicates that she found Dr. Musselman's opinion inconsistent with his own reports of record. (*See* AR 19.) However, upon finding that Dr. Musselman's opinion was not entitled to controlling weight, the ALJ did not weigh his opinion using the factors provided in 20 C.F.R. §§ 404.1527(c), 416.927(c). While the ALJ's decision indicates some consideration of factors three and four, regarding supportive evidence and consistency with the record, the ALJ does not discuss the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; or whether Dr. Musselman is a specialist in the area in which his opinion was rendered. Accordingly, I find that the ALJ committed legal error in failing to consider and discuss the remaining factors in determining the weight to assign to Dr. Musselman's opinion. On remand, the ALJ must properly evaluate Dr. Musselman's opinion and consider it when addressing step three of the sequential evaluation process. Because the Appeals Council made Dr. Musselman's May 10, 2012, letter and May 21, 2012, record part of the AR, these records shall also be considered by the ALJ in conducting the treating physician analysis upon remand.

In considering Dr. Musselman's opinion, the ALJ may not misrepresent Dr. Musselman's comment about Lacktis continuing to pursue her claim for Social Security benefits, and thereby also look negatively upon Lacktis's overall credibility. (*See* AR 20.) While the ALJ presents Dr. Musselman's comment as reflecting his lack of support for Lacktis's Social Security application because of improvements to her mental status, Dr. Musselman's actual comment was that

"[d]espite this improvement in her recent mental status, her pursuit of [Social Security] benefits is endorsed and supported." (AR 870.)

Upon assessing Dr. Musselman's opinion using the treating physician analysis, the ALJ shall also consider the credibility of Lacktis's testimony and Asbury and Strong's letter and affidavit, respectively, in deciding whether Lacktis meets listing 12.04(C)(3). The ALJ's decision must demonstrate that the ALJ considered all of the evidence in the record, though the ALJ "is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (citation omitted). "Rather, in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Id.* at 1110 (citations omitted). Such evidence includes "the individual's own statements about symptoms[ and] statements and other information provided by . . . other persons about the symptoms and how they affect the individual." SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Lacktis's testimony and the information contained in the letter and affidavit may, along with Dr. Musselman's opinion, be probative of whether Lacktis needs a "highly supportive living arrangement."

Because I have found legal error at step three and at the RFC stage of the sequential evaluation process, I do not address whether the ALJ's decision is supported by substantial evidence. I also note that Lacktis's argument that the ALJ erred in disregarding the findings of state medical consultant Dr. Walker in making her RFC assessment is without merit. Without naming Dr. Walker specifically, the ALJ gave "significant weight" to his opinion in making her RFC assessment. (*See* AR 20.)

## CONCLUSION

I recommend that the Court find that the ALJ did not err at step two in failing to name obesity, dyslexia, and hypothyroidism as severe impairments; and that the ALJ did not disregard the findings of Dr. Walker. I also recommend that the Court find that the ALJ committed legal error at step three by failing to properly consider Dr. Musselman's opinion. I recommend that the Court remand this case for proceedings consistent with this PFRD and direct the ALJ to consider and discuss the factors in 20 C.F.R. §§ 404.1527 and 416.927 for the treating physician analysis; the May 10 and May 21, 2012, records from Dr. Musselman; and the credibility of Lacktis's testimony and of the letter and affidavit from Asbury and Strong in determining whether Lacktis meets listing 12.04(C)(3).

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

William P. Lynch
United States Magistrate Judge

32

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.